UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Christi L. Straub, | § | |
|     Plaintiff, | § | |
| | § | CASE NO. 5:22-cv-213 |
| v. | § | |
| | § | |
| Equifax Information Services, LLC; First Bank & Trust; and DOES 1 through 100 inclusive, | § | |
| | § | |
|     Defendants. | § | |

COMES NOW Plaintiff **CHRISTI L. STRAUB** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

### INTRODUCTION

1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2. Defendant First Bank & Trust ("FB&T") is reporting an unauthorized account on Plaintiff's Equifax Information Services, LLC ("Equifax") report which includes multiple, derogatory notations. This account is detrimental to Plaintiff's creditworthiness and her ability to obtain new credit, and Plaintiff is neither an obligor nor authorized user on the account.

3. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4. Creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting debt information. Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

5. This was not the intent of Congress when it enacted the Fair Credit Reporting Act.

## JURISDICTION & VENUE

6. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

7. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

8. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

9. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

10. Plaintiff alleges that, unbeknownst to her, she was apparently added as an authorized user to the FB&T account and is not personally liable for the debt. Plaintiff first noticed this due to the account reporting on her credit report.

11. Plaintiff alleges, in an attempt to get the account removed, she revoked her authorized user status on the account; however, FB&T continues to report the account on her Equifax report.

12. Plaintiff alleges the FB&T tradeline contains derogatory reporting which is lowering her Credit Score and her ability to obtain new credit.

13. Plaintiff alleges the account is no longer reporting her as an authorized user, which she claims she never authorized, but is instead reporting in a manner which could mislead a credit reviewer into believing she is personally liable on the account.

14. Plaintiff alleges that each and every Defendant is familiar with FCRA requirements and subscribes thereto.

15. Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

16. Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair her Credit Score.

17. In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

18. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    FICO, Inc.**

19. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

20. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions. [1]

21. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

22. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

23. Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

24. There are twenty-eight (28) FICO Scores that are commonly used by lenders.

25. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. See https://www.myfico.com (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

26. The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

27. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

28. There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

29. Each of the five (5) factors is weighted differently by FICO.

30. In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

31. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

32. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

33. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

34. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

35. A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and

realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

36. Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.     e-OSCAR**

37. e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

38. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

39. The ACDV contains within it codes next to certain data fields associated with a credit file.

40. When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

41. When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

42. For clarification, an AUD, or other regular transmission, is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**C.     Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

43. On July 30, 2021, Plaintiff ordered an Equifax credit report and a TransUnion credit report to ensure proper reporting by Plaintiff's creditors (the "July 30 Credit Reports").

44. Plaintiff noticed adverse tradelines in her July 30 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

45. Plaintiff then disputed the inaccurate tradelines regarding the FB&T account via certified mail to Equifax and TransUnion on or about August 31, 2021 (the "Dispute Letters").

46. Plaintiff's Dispute Letters specifically put FB&T on notice that her authorized user status was revoked and that the reporting of the account should be removed as it was not authorized.

47. Plaintiff requested that the FB&T account be deleted from her credit reports as she had revoked her authorized user status to the extent ever given.

48. Plaintiff's Dispute Letter also detailed what was perceived to be problematic about the account, addressing each tradeline individually.

49. Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the account as required by the FCRA.

50. Plaintiff is informed and believes that Equifax and TransUnion both received Plaintiff's Dispute Letters and, in response, sent Plaintiff's disputes to FB&T, as the data furnisher, via an ACDV through e-OSCAR.

51. On November 3, 2021, Plaintiff ordered a second Equifax credit report and TransUnion credit report to determine if her account was updated.

    a. **Inaccuracy – FB&T**

52. Despite actual knowledge, FB&T continued, without authorization, to report an unauthorized account, beginning in 523222000476XXXX, to Equifax. This account has a current account status of "Charge-off", high credit balance over the credit limit, and lists the owner of the account as "Undesignated".

53. Reporting an authorized user account after the authorized user designation has been revoked is patently incorrect. Further, as this tradeline is replete with derogatory information, the fact that it is showing on Plaintiff's credit report is lowering her Credit Score, and it is misleading to an extent to adversely affect credit decisions.

54. In addition, since the account was never authorized to begin with, and it is not even reporting as an authorized user account, it is misleading as it appears this is Plaintiff's account and she is personally liable for the debt.

55. FB&T did not update the reporting to delete the unauthorized account.

56. Equifax and TransUnion both provided notice to FB&T that Plaintiff was disputing the inaccurate and misleading information, but FB&T failed to conduct a reasonable investigation of the information as required by the FCRA.

57. The most basic investigation would include a simple review of internal documentation on the account (i.e., the fact this account is not authorized to be reported) compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

58. Plaintiff alleges that FB&T did not review if its reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or its own internal records concerning Plaintiff's responsibility on the account.

59. If FB&T reviewed such standards, or its own internal records regarding Plaintiff's connection or responsibility on the account, FB&T would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

60. By continuing to report the account to Equifax as described in paragraph 52, it incorrectly appears to third parties viewing Plaintiff's credit report that Plaintiff is personally liable for the debt that is charged off and outstanding, which in inaccurate.

61. Further, as this severely derogatory account is being used to calculate Plaintiff's Credit Score, the Credit Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

62. The lack of investigation and reporting of inaccurate and incomplete information by FB&T is unreasonable.

**Damages**

63. Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

64. As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

65. Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by FB&T. Further, Plaintiff's diminished creditworthiness, resulting from FB&T's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

66. FB&T's actions, as alleged herein, are each in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

**FIRST CAUSE OF ACTION**
**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))**
**(Against Defendants and Does 1-100)**

67. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Equifax Failed to Assure Credit Reporting Accuracy**

68. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

69. Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported the FB&T account as described herein.

70. Equifax knew, or should have known, that (1) if this was an authorized user account, Plaintiff revoked her authorized user status on the FB&T account and the tradeline should have been deleted, (2) the tradeline was derogatory and detrimental to Plaintiff's Credit Score, and (3) if this was an authorized user account, it should not be showing in a manner which appears she is personally liable. Further, Equifax knew, or should have known, that continuing to report the account does not reflect maximum possible accuracy and completeness as required by the FCRA.

71. Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019). The investigation and evaluation of Plaintiff's creditworthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the inaccurate reporting Equifax allowed.

72. As a result of Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

**B.     Willful Violations**

73. Equifax's violations, as described herein, were willful; specifically, Equifax has intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

74. Equifax regularly, as a policy, ignores disputes by consumers and fails to perform even a basic investigation regarding the disputes. Additionally, Equifax regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

75. To the extent Equifax does send consumer disputes, it sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

76. Equifax's employees receive little to no training concerning how to accurately report consumer debt.

77. Instead, Equifax's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

78. Equifax's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

79. Equifax has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

80. As a result of Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

81. Equifax's violations were willful, rendering it liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

82. In the alternative, Equifax was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

83. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))
### (Against Defendants and Does 1-100)

84. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  FB&T Failed to Reinvestigate Following Plaintiff's Disputes**

85. Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

86. FB&T sent an AUD or monthly transmission to Equifax reporting the account on Plaintiff's Equifax credit report and TransUnion credit report.

87. After receiving the Plaintiff's Dispute Letters, the FB&T tradeline was deleted on Plaintiff's TransUnion report.

88. After receiving the Plaintiff's Dispute Letters, FB&T did not delete the unauthorized tradeline on the Equifax report. Instead, despite having knowledge of Plaintiff's revocation, FB&T verified and re-reported the tradeline to Equifax via ACDV.

89. FB&T violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation at all or by failing to conduct a reasonable investigation, and under either event, re-reporting misleading and inaccurate account information.

90. Equifax and TransUnion both provided notice to FB&T that Plaintiff was disputing the inaccurate and misleading information; however, FB&T failed to conduct a reasonable investigation as required by the FCRA.

91. Based on Plaintiff's disputes, FB&T should have known the account was not authorized and should have ceased its inaccurate reporting.

92. It is undisputable that the FB&T account in question contains multiple derogatory items and that it has a negative impact on Plaintiff's creditworthiness.

93. As Plaintiff never consented for this account to be reported, it should have never been placed on her credit report. The fact it is reporting at all is patently incorrect and misleading as to Plaintiff's creditworthiness.

94. If FB&T believed Plaintiff was an authorized user, it should have ceased reporting once that status was revoked. Likewise, if FB&T believed this, it should have reported the account as such and not as "undesignated". The way FB&T is reporting the account is patently incorrect and misleading as to Plaintiff's creditworthiness.

95. In the alternative, in the event Equifax failed to comply with its statutory duty to forward Plaintiff's Dispute Letters to FB&T and FB&T only received an ACDV from TransUnion, FB&T still had a duty to correct and update reporting to all credit bureaus under 15 U.S.C. § 1681s-2(b)(1)(D), which it failed to do.

96. Based on Plaintiff's disputes and review of its internal records on the account, FB&T should have known its account should not be reporting on Plaintiff's credit report and ceased its inaccurate reporting.

97. In addition, this inaccurate reporting also adversely affects credit decisions. Derogatory marks like charge off account status goes into calculating a Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported Credit Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, FB&T's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and her ability to rebuild her Credit Score and obtain new credit.

98. The lack of investigation by FB&T, as required by the FCRA, is unreasonable.

**B. Willful Violations**

99. Plaintiff alleges that FB&T has reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

100. Plaintiff further alleges that FB&T has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, has developed reckless policies and procedures.

101. Plaintiff alleges that rather than train its employees on accurate credit reporting, FCRA requirements, and industry standards, FB&T's employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

102. In the alternative, FB&T was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

C. **Equifax Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

103. Pursuant to 15 U.S.C. 1681i(a)(1), Equifax was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's disputes regarding the FB&T account.

104. Thus, Equifax failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the account within the statutory time frame.

105. Equifax is not a passive entity bound to report whatever information a data furnisher provides.

106. Plaintiff alleges Equifax is readily familiar with FCRA requirements and credit reporting industry standards.

107. Based on the foregoing, Plaintiff alleges that Equifax can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

108. Equifax can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

109. Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that FB&T was not reporting its account at issue correctly.

110. Had Equifax conducted a proper investigation, it could have suppressed the FB&T debt from reporting on Plaintiff's credit report. However, Equifax continued to report the account as described herein.

111. Equifax, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

112. In the alternative, Plaintiff alleges that Equifax did not send an ACDV to FB&T to confirm accurate reporting on its account. Despite receiving the Dispute Letters providing notice of the inaccuracies, Equifax did not delete or correct the tradelines or conduct an investigation.

113. In the alternative, if Equifax deemed Plaintiff's Dispute Letters "frivolous or irrelevant" under 15 U.S.C. 1681i(a)(3), Equifax failed to notify Plaintiff of such determination as required by 15 U.S.C. 1681i(a)(3)(B). As Plaintiff received no such notice from Equifax, Plaintiff alleges Equifax deemed her Dispute Letters valid, and thus triggered its obligations under 15 U.S.C. 1681i(a)(1) and (2)(A), for which it did not comply.

## THIRD CAUSE OF ACTION
## (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
## (Against Defendants and Does 1-100)

114. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A. Equifax Failed to Review and Consider all Relevant Information**

115. Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

116. Equifax's violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B. Willful Violations**

117. Equifax's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

118. In the alternative, Equifax was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

119. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

### (Against Defendants and Does 1-100)

120. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.   Equifax Failed to Delete Disputed and Inaccurate Information**

121. Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

122. Equifax's violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.   Willful Violations**

123. Equifax's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

124. In the alternative, Equifax was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

125. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

126. WHEREFORE, Plaintiff prays for judgment as follows:

   a. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;
   b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;
   c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;
   d. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;
   e. For determination by the Court that Defendants' policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

    **f.** For determination by the Court that Defendants' policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: March 4, 2022

*/s/ Kyle Schumacher*
Kyle Schumacher
kyle@schumacherlane.com
P.O. Box 558
Spring Branch, TX 78070
503-482-8137 ph
210-783-1383 fax
Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial of this matter by jury.

                                                    **SCHUMACHER LANE PLLC**

Dated: March 4, 2022                                    */s/ Kyle Schumacher*
                                                                  Kyle Schumacher
                                                                  Attorneys for Plaintiff